UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.R. Automation Technologies, LLC, Plaintiff, -against- Carlos Cruz, Eric Bert, and David MacPhail, Defendants. | 25-cv-3417 (AS) Consolidated with: 25-cv-3418 25-cv-3419 25-cv-4945 25-cv-4946 |

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Across five actions, plaintiff J.R. Automation Technologies, LLC ("JRA"), alleges breach of contract by thirteen former employees, all of whom left for one of five competitors. *See J.R. Automation Technologies, LLC v. Cruz*, Case No. 25-cv-3417 (S.D.N.Y.); *J.R. Automation Technologies, LLC v. McIllwain*, Case No. 25-cv-3418 (S.D.N.Y.); *J.R. Automation Technologies, LLC v. Lowell*, No. 25-cv-3419 (S.D.N.Y.); *J.R. Automation Technologies, LLC v. Sarchet*, Case No. 25-cv-4945 (S.D.N.Y.); *J.R. Automation Technologies, LLC v. Holstege*, Case No. 25-cv-4946 (S.D.N.Y.). JRA seeks to enforce non-competition and non-solicitation provisions contained in the contracts that each defendant signed with J.R. Technology Holdings, LLC ("JRT"), JRA's erstwhile holding company. Defendants have moved to dismiss these cases under Federal Rule of Civil Procedure 12(b)(6), arguing that JRA has no right to enforce the contracts they signed with JRT. Defendants' motions are GRANTED with prejudice.

## BACKGROUND

JRA is part of J.R. Technology Group, LLC ("JRT Group"), which designs, builds, and installs automated production systems for manufacturing companies across the globe. Third Am. Compl., Dkt. 53 ¶ 2. Both JRA and JRT Group used to be owned by JRT. *Id.* ¶ 33. During that period, defendants—all of whom held executive or managerial positions at JRA—signed "Management Incentive Unit Agreements" with JRT. Dkts. 53-1, 53-2, 53-3; Case No. 25-cv-3418, Dkts. 49-1, 49-2, 49-3, 49-4, 49-5; Case No. 25-cv-3419, Dkts. 47-1, 47-2; Case No. 25-cv-4945, Dkts. 41-1, 41-2; Case No. 25-cv-4946, Dkt. 41-1.

The Agreements each contained a series of restrictive covenants, including non-competition and non-solicitation provisions. The non-competition provision provides:

> [D]uring Executive employment with the Company or any of its Subsidiaries and for a period of twelve (12) months thereafter, Executive agrees that Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services

> to any Person, firm, corporation or other entity, in whatever form, engaged in competition with the Company or any of its Subsidiaries or in any other material business in which the Company or any of its Subsidiaries is engaged on the date of termination.

Dkt. 53-1 at 7. And the non-solicitation provision reads:

> During Executive's employment with the Company or any of its Subsidiaries and for a period of twelve (12) months thereafter, Executive agrees that Executive shall not . . . solicit, aid or induce any employee, representative or agent of the Company or any of its Subsidiaries to leave such employment or retention or to accept employment with or render services to or with any other Person, firm, corporation or other entity unaffiliated with the Company.

*Id.* The Agreement also grants each JRT affiliate third-party beneficiary status and the right to enforce any contractual obligation owed to that affiliate. *Id.* at 9. "Affiliate" and "Subsidiary" are not defined by the Agreement. Rather, their definitions are incorporated from JRT's LLC Agreement by reference. *Id.* at 6. Here's how the LLC Agreement defines "Affiliate":

> "Affiliate" of any particular Person means (a) any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, and (b) if such Person is a partnership or limited liability company, any general partner or managing member thereof (as applicable).

Dkt. 53-4 at 2. And "Subsidiary":

> "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which . . . if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of company, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

*Id.* at 8.

In 2019, Hitachi Industrial Holdings Americas, Inc. ("Hitachi"), acquired JRT Group and JRA. Third Am. Compl., Dkt. 53 ¶ 47. JRT retained no equity in JRT Group. *Id.* It is undisputed that JRT didn't assign or otherwise transfer the Agreements to Hitachi, JRT Group, or JRA. Several years after the Hitachi acquisition, defendants resigned. *See id.* ¶ 54. It isn't clear from the complaints when they did so. *See, e.g.*, *id.* ¶ 50; Case No. 25-cv-3419, First Am. Compl. Dkt. 47 ¶ 48. But it is clear that they subsequently all took jobs at companies alleged to be JRA's competitors and, in each case, were followed by a significant number of other employees.

The complaints paint a picture of a company slammed by waves of employee departures. Three employees left for Convergix Automation Solutions, LLC: Carlos Cruz-Bosque, general manager; Eric Bert, senior in-house counsel; and David MacPhail, business development manager for aero-

space. Third Am. Compl. ¶¶ 12–14; 50–51, Dkt. 53. They were followed by dozens of other employees. *Id.* ¶ 52. Five left for Mission Design & Automation, LLC: Tim McIllwain, operations manager; Scott Beute, director of advanced applications; Gerald Halford, vice-president; Brad Bush, operations specialist; and Mitch Veldheer, former general manager. Case No. 25-cv-3418, First Am. Compl. ¶¶ 12–16; 54–55, Dkt. 49. After these five departures, dozens of JRA employees also resigned and accepted positions at Mission Design & Automation. *Id.* ¶ 56. Two general managers, Vince Lowell and Ben Garvelink, left for Huizenga Group Automation, respectively becoming president and vice president of that company. Case No. 25-cv-3419, First Am. Compl. ¶¶ 12–13; 48–49, Dkt. 47. And they allegedly took around a dozen employees with them. *Id.* ¶ 50. Senior account managers Steve Sarchet and Dan Brcic left for Axis Automation, followed by more than ten other employees. Case No. 25-cv-4945, First Am. Compl. ¶¶ 12–13; 47–49, Dkt. 41. Finally, Kurt Holstege, general manager, left for Specialty Tooling Systems, Inc., followed by dozens of others. Case No. 25-cv-4946, First Am. Compl. ¶¶ 7, 11; 45–47, Dkt. 41.

JRA then filed five separate but substantively identical breach-of-contract actions against the former employees named above between April and June 2025. Third Am. Compl., Dkt. 53; Case No. 25-cv-3418, First Am. Compl., Dkt. 49; Case No. 25-cv-3419, First Am. Compl., Dkt. 47; Case No. 25-cv-4945, First Am. Compl., Dkt. 41; Case No. 25-cv-4946, First Am. Compl., Dkt. 41.

## LEGAL STANDARD

When ruling on a motion under Rule 12(b)(6), the Court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Littlejohn v. City of New York*, 795 F.3d 297, 306–07 (2d Cir. 2015). To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). In addition to the complaint itself, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading" and may be considered by the Court. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

## DISCUSSION

The parties agree that jurisdiction is proper here,[1] and that Delaware law governs these five actions. "Under New York choice-of-law rules, where the parties agree that a certain jurisdiction's

---

[1] The Court has diversity jurisdiction over this action. First, the Court accepts JRA's assertion that each breach of contract claim exceeds the $75,000 amount in controversy requirement. *See Chase Manhattan Bank, N.A. v. American Nat'l Bank and Trust Co.*, 93 F.3d 1064, 1070 (2d Cir. 1996) ("[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith." (citation omitted)). Second, there is complete diversity of citizenship because JRA is a citizen of Delaware and Illinois and no defendant is a citizen of either state. As an LLC, JRA takes on the citizenship of its members. *See Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51–52 (2d Cir. 2000). JRA's sole member is JRT Group, LLC, whose sole member is in turn Hitachi, a Delaware corporation with its principal place of business in Illinois. Third Am. Compl., Dkt. 53 ¶ 10; *Tanjutco v. NYLife Sec. LLC*, 2025 WL 3526470, at *3 (2d Cir. 2025) ("For

law controls, this is sufficient to establish choice of law." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (cleaned up).

Under Delaware contract law, as under American contract law generally, "[i]t is axiomatic that either party to an agreement may enforce its terms for breach thereof. Equally settled is the principle that a third person, who is, in effect, a stranger to the contract, may enforce a contractual promise in his own right and name if the contract has been made for his benefit." *Triple C Railcar Serv., Inc. v. City of Wilmington*, 630 A.2d 629, 633 (Del. 1993) (citations omitted). "A third-party beneficiary is an incidental beneficiary unless the parties to the contract intended to confer a benefit upon it." *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007). The Court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quotation omitted). Contract language is given its "common or ordinary meaning, and interpret[ed] as would an objectively reasonable third-party observer." *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) (quotations omitted). "When the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls." *Id.*

While context cannot override an agreement's plain meaning, a contract should be "situated in the commercial context between the parties." *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017). "[T]he basic business relationship between the parties must be understood to give sensible life to any contract." *Id.* at 927.

JRA alleges that each defendant breached their Agreement by accepting employment with a competitor within the twelve-month non-competition period, soliciting other employees to leave alongside them, and soliciting JRA's actual and prospective customers. *See, e.g.*, Third Am. Compl. ¶¶ 50–61, Dkt. 53. According to JRA, it maintained the right to enforce the Agreements after the Hitachi acquisition either as a party or a third-party beneficiary. *See, e.g.*, *id.* ¶ 49; Pl.'s Resp. Mot. Dismiss. 7–14, Dkt. 58. On JRA's view, even though it wasn't a signatory to the Agreements, it was nevertheless covered, because it was a subsidiary of JRT at the time of contracting. It doesn't matter, says JRA, that JRT shed JRA years before the alleged breaches happened.

By contrast, defendants argue that JRA cannot enforce the Agreements because it is neither a party to the Agreements nor a third-party beneficiary. Letter Resp. Pl.'s Third Am. Compl. 2–4, Dkt. 54; Case No. 25-cv-3418, Defs.' Mem. Supp. Mot. Dismiss 4–10, Dkt. 51; Case No. 25-cv-3419, Defs.' Mem. Supp. Mot. Dismiss 4–10, Dkt. 49; Case No. 25-cv-4945, Defs.' Mem. Supp. Mot. Dismiss 4–10, Dkt. 43; Case No. 25-cv-4946, Def.'s Mem. Supp. Mot. Dismiss 4–10, Dkt. 43. Whether a party is an affiliate or a subsidiary, defendants contend, is measured at the time of alleged breach, not at the time of contracting. Letter Resp. 3, Dkt. 54; *see, e.g.*, Case No. 25-cv-3418, Defs.' Mem. 7, Dkt. 51.

---

diversity purposes, a corporation is considered a citizen of the state in which it is incorporated and the state of its principal place of business." (citation omitted)).

For the reasons set forth below, defendants are right. Their reading is the only reasonable interpretation of the text of the Agreements, especially when considering their commercial context.

## I. JRA was not an "Affiliate" or "Subsidiary" under the Agreements at the time of alleged breach, so it cannot enforce them against defendants

JRA claims the right to enforce the restrictive covenants either as a party to or as a third-party beneficiary of the Agreements. Third Am. Compl. ¶¶ 42–45, Dkt. 53. JRA makes the same argument in support of both theories: that it was an "Affiliate" and "Subsidiary" of JRT at the time of contracting and it relied on the Agreements in its dealings with defendants, so its right to enforce the Agreements "vested." *Id.*; Pl.'s Resp. 4, Dkt. 58. Accordingly, JRA says, it has the right to enforce the restrictive covenants in perpetuity.[2] But the Agreements' plain text, properly situated in its "commercial context," make clear that JRA has no right to enforce the Agreements.

As a preliminary matter, JRA is not a party to any of the Agreements. (JRA argues it is a "presumptive party" to the Agreements, but it is unclear what that means other than "party" to the Agreements. *See, e.g.*, Pl.'s Resp. 1, Dkt. 58.) Each Agreement is between JRT and a specific defendant. *See, e.g.*, Dkt. 53-1, at 2 ("[This Agreement] is made this June 13, 2018, by and between JR Technology Holdings, LLC, a Delaware limited liability company (the 'Company') and Carlos E. Cruz-Bosque ('Executive')."). This alone is sufficient to debunk JRA's assertion that it is a party to the Agreements. However, accepting JRA's argument that JRT's "Affiliates" and "Subsidiaries" are parties does not rescue its claim.

JRA's interpretation would lead to irrational applications of several of the Agreements' provisions. For example, in exchange for agreeing to the restrictive covenants, including the non-competition and non-solicitation provisions at issue here, defendants secured the right to obtain "Management Incentive Units." Dkt. 53-1, at 1. These units, also called "Executive Units" by the Agreements, granted defendants equity in JRT. Dkt. 53-4, at 12. The Remedies provision provides that in the event of "any material violation" of the restrictive covenants that "any Executive Units outstanding at the time of such violation shall be immediately forfeited and cancelled as of the date of such violation" and that JRT can "recover from Executive" any amounts paid for any previously redeemed Executive Units. *Id.* So on JRA's view, the defendants' breach of their restrictive covenants would permit JRT, who has been out of the picture for years, to pursue relief under this provision, and even claw back the value of any redeemed Executive Units? That makes no sense.

Next, take the confidentiality covenant, which bars the signees from using or disclosing "Confidential Information" of "the Company or its Affiliates," except "for the benefit of the Company" (i.e., JRT). Dkt. 53-1, at 6. According to JRA's theory of affiliate status, this means that after the

---

[2] JRA doesn't fully spell out its theory of when the Agreements convey "Affiliate" or "Subsidiary" status and how long that status lasts. (It spends basically no time analyzing the definitions themselves. *See* Pl.'s Resp. 12, Dkt. 58; Third Am. Compl., Dkt. 53 at ¶¶ 37–42.) The best reading of JRA's argument is that it thinks that those entities owned or controlled by JRT at the time of contracting *and* those owned or controlled later are affiliates and subsidiaries. But it could be that *only* those entities owned or controlled by JRT at the time of contracting can *ever* be affiliates or subsidiaries. Both theories are incorrect.

Hitachi deal, the Agreements required defendants to use or disclose any confidential information of JRA's obtained after that deal *only for the benefit of JRT*, even though JRT was out of the picture and had no plausible interest in JRA's post-acquisition confidential information. That bizarre consequence further counsels against JRA's interpretation.

Another point against JRA is the effect of its reading on the Agreement's intellectual property arrangement. Under the inventions provision, any intellectual property arising out of a signee's employment "during the period of [a signee's] employment with the company or any of its Subsidiaries . . . shall belong exclusively to *the Company and* the applicable Subsidiaries." *Id.* at 8 (emphasis added). If JRA is right, then any intellectual property generated by defendants after the Hitachi acquisition and before their departure from JRA is the property of both JRA *and JRT*. That, of course, makes no sense and would come as a shock to both JRA and Hitachi.

Finally, consider the non-competition and non-solicitation provisions themselves. Both apply "during Executive employment with the Company or any of its Subsidiaries and for a period of twelve (12) months thereafter." *Id.* at 6–7. These are enforceable by JRT under the Agreements' Remedies provision, because of course, the whole point of the Agreements was to protect JRT's interests. But under JRA's time-of-contracting argument, these provisions (along with the others discussed above) would apply, and be enforceable not only by JRT's affiliates, *but also by JRT itself*, where an employee has left a former subsidiary long after it was acquired by a third party, and JRT has no interest of any kind. If the parties to the Agreements, for whatever reason, intended such a result, the definitions of "Affiliate" and "Subsidiary" would have to clearly apply to JRT's affiliates at the time of contracting, for instance listing them by name, which would have been easy enough to do. They don't.

That brings us to the definitions of "Affiliate" and "Subsidiary." Per the definitions in JRT's LLC Agreement (its definitions are incorporated by reference, *id.* at 6), an "Affiliate" of JRT is simply any entity "controlling, controlled by or under common control with" JRT. Dkt. 53-4, at 2. For an entity to have "control" over another it must have "the power to direct the management and policies" of the other. *Id.* For LLCs like JRA, any entity that is a "general partner or managing member thereof" has "control" over it. *Id.* And when a majority of an LLC's "ownership interest thereof is at the time owned or controlled" by another entity, that LLC is a "subsidiary" of that entity. *Id.* at 8.

Instead of supporting JRA's view, these definitions further undermine it. To begin, the definition of "Affiliate" defines the operative word "control" in the present, not the past, tense. It does not say, for example, that "control" means *ever* having had the power to direct an entity's management and policy. Similarly, it does not provide that *ever* having been a general or managing member of a partnership or LLC is sufficient to make that entity an "Affiliate" of another. Had the parties intended for affiliate status to be fixed in place from the time of contracting forward, they could have said as much.

On this point, the Court is further guided by the Delaware Court of Chancery's analysis of a functionally identical definition of "Affiliate" in *Symbiont.io, Inc. v. Ipreo Holdings, LLC*, 2021

WL 3575709 (Del. Ch. Aug. 13, 2021). There, a contract defined "affiliate" as "with respect to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with, such Person." *Id.* at *28. The operative word "control" was defined as follows:

> For purposes of this Agreement, "control," when used with respect to any specified Person, shall mean (a) the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; (b) the ownership, directly or indirectly, of not less than fifty percent (50%) of the then outstanding (i) stock, if the entity is a corporation, or (ii) partnership interests, membership interests, other entity interests or profit interests, if the entity is a partnership, limited liability company or other entity, or (c) if the entity is a partnership or limited liability company, control of the general partner or managing member(s).

*Id.* at * 29. Based on this language, the *Symbiont* court concluded that "[t]he plain language of the Affiliate Definition calls for determining a Person's status as an 'Affiliate' when contractual compliance is measured." *Id.*; *see also, e.g., id.* at *32 ("When the Affiliate Definition is read as a whole, the plain language demonstrates that it uses the present tense to ask whether a Person is an Affiliate at the time of the alleged breach.").

Moving along from "Affiliate" brings us to the definition of "Subsidiary." That definition is even more temporally precise. Throughout, the definition clarifies that a subsidiary is an entity that is "*at the time* owned or controlled" by another, and that references to a subsidiary are "given effect only at times that such Person has one or more Subsidiaries." Dkt. 53-4, at 8–9 (emphasis added). This makes clear that subsidiary status depends on current circumstances. So when the defendants were trying to figure out whether, upon departure from JRA, they would owe it or JRT duties of non-competition and non-solicitation under the Agreements, they would look to the time of their departure, based on the definition of "Subsidiary." Once again, subsidiary status, just like affiliate status, is measured at the time of the alleged breach.

The language and commercial context of the Agreements, and just plain old common sense, indicates that whether an entity is an affiliate or subsidiary of JRT is determined when contractual compliance is measured, not at the time of contracting. As JRA ceased to be an affiliate or subsidiary of JRT after the Hitachi acquisition, JRA lacks the right to sue for breach of the Agreements.

## II. JRA's arguments beg the question of when to measure "Affiliate" and "Subsidiary" status

Against this conclusion, JRA endeavors to avoid the plain text of the Agreements through inapplicable rules of corporate and contract law. It cites the "general principle of corporate law that all assets and liabilities are transferred in the sale of a company effected by a sale of stock." Pl.'s Resp. 13, Dkt. 58 (quoting *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *6 (Del. Ch. June 18, 2018)). But even if "[t]he familiar default rule in stock sales is that a change in ownership of a company does not affect the rights and liabilities of the company," *Viking*

*Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 99 (Del. Ch. 2009), that doesn't address the fundamental issue here, which is what rights JRA actually had by virtue of being a subsidiary of JRT at the time the Agreements were signed. As discussed, any such rights do not permit enforcement under these factual circumstances.

Similarly question-begging is JRA's third-party beneficiary argument. While JRA says this is an alternative theory, it's not. That's because whether JRA is a third-party beneficiary is the same as the question of whether JRA is an affiliate. Dkt. 53-1, at 9 ("It is also agreed that each of the Company's Affiliates will have the right to enforce all of Executive's obligations to that Affiliate under this Agreement, including without limitation pursuant to this Section 5, and shall be third-party beneficiaries hereunder."). This is the only mention of third-party beneficiaries in the entire Agreement. And as previously discussed, JRA isn't an affiliate or subsidiary with enforcement rights over the issues in these cases. So, whether JRA is a third-party beneficiary needs no separate consideration.

Next, JRA says it can enforce the Agreements because its rights "vested" once it began to rely on the restrictive covenants. It's true that a third-party beneficiary's rights under a contract typically vest once they begin to rely on that contract. *See Crispo v. Musk*, 304 A.3d 567, 573–74, 574 n.34 (Del. Ch. 2023). But once again, this turns on whether JRA is an affiliate or subsidiary whose vested rights were infringed as to the issues in this case. It isn't. Instead, based on the Agreements' definitions, *see id.* at 573 ("A third-party beneficiary's rights are measured by the terms of the contract." (quoting *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271–72 (Del. 2022)), whether a party is an "Affiliate" or "Subsidiary," and thus a third-party beneficiary entitled to enforce the Agreements' terms, is determined at the time of the alleged breach, not at the time of contracting. With respect to the issues raised in these cases, then, JRA had no rights that ever vested.

Finally, rejecting JRA's argument does no mischief to law or policy. Under normal circumstances, where contractual rights are desired on the part of a company like Hitachi, they can be bargained for as part of the transaction. Had Hitachi wanted to, it could have sought assignment of the rights under the Agreements when it acquired JRT Group and JRA. It didn't. Alternatively, JRA and Hitachi could have had defendants sign new restrictive covenants after the acquisition. Based on this record, that didn't happen.

## CONCLUSION

JRA's interpretation would require the Court to find that JRT and defendants, in addition to contracting for their own benefit, also sought to protect JRT's then-subsidiary in perpetuity, even if JRT's material interest in JRA and defendants dissipated. But here, the Agreements are susceptible to only one reasonable interpretation: Affiliate and subsidiary status are measured at the time of alleged breach.

Accordingly, defendants' motions to dismiss JRA's complaints are GRANTED. The Clerk of Court is respectfully directed to terminate all pending motions in 25-cv-3417, 25-cv-3418, 25-cv-3419, 25-cv-4945, and 25-cv-4946, and to enter judgment for defendants in these actions.

SO ORDERED.

Dated: August 6, 2026
New York, New York

ARUN SUBRAMANIAN
United States District Judge